# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 29, 2021

Lyle W. Cayce
Clerk

No. 20-40811

LEDELL COLEMAN,

*Plaintiff—Appellant*,

*versus*

BP EXPLORATION & PRODUCTION, INCORPORATED; GRAND ISLE SHIPPING, L.L.C.,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 3:19-CV-102

Before HIGGINBOTHAM, WILLETT, and DUNCAN, *Circuit Judges*.

DON R. WILLETT, *Circuit Judge*:

High ocean winds caused an oil-platform worker to injure his back while building scaffolding. He sued the companies managing both the day-to-day construction and the overall construction project. Neither company was his direct employer. Because a reasonable jury could not find either company liable for the worker's injury, we AFFIRM summary judgment for Defendants.

No. 20-40811

I

Shell Pipeline Co. LP wanted to expand a fixed oil platform that it operated out on the Outer Continental Shelf ("OCS"), off Louisiana's coast. Not wanting to manage the expansion project itself, Shell engaged BP Exploration & Production. BP then delegated the project's day-to-day management to Grand Isle Shipping, LLC. From there, Grand Isle engaged Brand Energy Services to build some scaffolding on the platform. One of Brand's scaffold builders was Ledell Coleman, the plaintiff appellant.

Safety out on the platform was paramount. BP made everyone adopt and receive training on its safety rules; required Grand Isle to "take full responsibility for the . . . safety of all its operations and methods"; used on-site safety supervisors; and delegated to everyone authority to "stop work" if conditions were unsafe. Grand Isle did similarly. It required Brand to expressly warrant that its workers could perform the work "safely"; also used on-site safety supervisors; tightly controlled access to the tools that Brand used to build the scaffolding; and issued applicable safety equipment to Brand's employees. Brand, in turn, retained autonomy over when it would work. It completed a "Job Safety Environmental Assessment" before every shift and, as part of that assessment, considered "weather conditions" when deciding "the right time" to work.

The right time to work was not when Coleman first arrived at the platform. High winds kept Coleman on a housing vessel, located adjacent to the platform, for five days after he arrived. On the fifth day, though, BP told Brand that the wind had died down to "like, 22" knots. Brand decided that "now [is] the right time to [do] the work." BP then began to transport Coleman and other Brand workers onto the platform.

Though the wind continued, Coleman arrived at the platform and began to build the scaffolding. To build the scaffolding, Coleman had to carry

2

No. 20-40811

heavy, eight-foot-long scaffolding boards. At some point while he was carrying a board, the wind gusted and "got up under it." Coleman tried to "snatch[] it to keep it from going overboard." Something in his back "popped" and his back began to hurt. Coleman informed his supervisor and returned to the housing vessel. He was evacuated the next day.

Coleman sued BP and Grand Isle in Texas state court for negligence.[1] Grand Isle removed the case to federal district court. Following discovery, each Defendant moved for summary judgment on Coleman's remaining claims. They argued that Louisiana's independent-contractor rule barred holding them liable for Brand's negligence. They further argued that no evidence supported that they committed independent negligent acts against Coleman. The district court agreed, granted both motions, and then entered a final judgment dismissing Coleman's claims. Coleman appealed.

## II

We review summary judgment de novo and apply the same standard as the district court.[2] We may affirm only if no genuine dispute of material fact exists and Defendants were entitled to judgment as a matter of law.[3] Defendants may satisfy their burden by demonstrating "a complete failure of proof" on an "essential element" of Coleman's case.[4] Still, we must view all evidence and draw all justifiable inferences in favor of Coleman, the

---

[1] Coleman brought other claims as well, but he agreed to dismiss them prior to Defendants' motions for summary judgment.

[2] *Hall CA-NV, L.L.C. v. Old Republic Nat'l Title Ins. Co.*, 990 F.3d 933, 936 (5th Cir. 2021) (citation omitted).

[3] *Id.*

[4] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

nonmovant.[5] A "genuine" fact dispute exists only if a reasonable jury could return a verdict for Coleman based on the evidence.[6] "Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial."[7]

The parties agree that we should look to Louisiana law in evaluating Coleman's claims against the summary-judgment standard. We agree with a caveat. The platform where Coleman was injured was located off Louisiana's coast and affixed to the OCS. *Federal* law exclusively governs out on the OCS.[8] Not the state of Louisiana's. But given the platform's location, we will *adopt* Louisiana law "as surrogate federal law" when it is "applicable and not inconsistent with . . . other Federal laws."[9]

Louisiana vicarious-liability and negligence law is applicable and not inconsistent with other federal laws in this case. As the Supreme Court recently explained, we adopt state law "only where there is a gap in federal law's coverage."[10] If "a federal law addresses the issue at hand," then no gap exists.[11] The parties do not point us to any federal laws that address the merits

---

[5] *Old Republic*, 990 F.3d at 936 (citation omitted).

[6] *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002).

[7] *Id.*

[8] *Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 357 (1969) (holding that "federal law is 'exclusive' in its regulation" of "artificial islands and fixed structures erected" out on the OCS (quoting Outer Continental Shelf Lands Act, ch. 345, sec. 4, 67 Stat. 462, 462 (1953) (codified as amended 43 U.S.C. § 1333) [hereinafter OCSLA])).

[9] *Id.* (quoting OCSLA section 4).

[10] *Parker Drilling Mgmt. Svcs., Ltd. v. Newton*, 139 S. Ct. 1881, 1892 (2019).

[11] *Id.*

No. 20-40811

in this case. Therefore, we will adopt Louisiana law—as surrogate federal law—in deciding it.

## III

Coleman contends that a genuine dispute of material fact exists on whether Defendants are vicariously liable for Brand's negligence. He bases his contention on three different theories: (A) that Brand was not an independent contractor with respect to Defendants; (B) even if Brand was an independent contractor, then Defendants exercised operational control over it; and (C) even if Brand was an independent contractor, then Defendants are vicariously liable for authorizing unsafe work practices. We are unpersuaded.

## A

Coleman's first vicarious-liability theory is that Brand was not Defendants' independent contractor, but their employee. Adopting Louisiana law, "a principal is not liable for the negligent acts of an independent contractor acting pursuant to the contract."[12] The five "*Hickman*" factors govern deciding whether Brand qualified as an independent contractor.[13] On this evidence their balance weighs in Defendants' favor.

---

[12] *E.g.*, *Graham v. Amoco Oil Co.*, 21 F.3d 643, 645 (5th Cir. 1994) (citation omitted).

[13] *Hickman v. S. Pac. Transp. Co.*, 262 So. 2d 385, 390–91 (La. 1972); *see also Tower Credit, Inc. v. Carpenter*, 825 So. 2d 1125, 1129 (La. 2002) (summarizing the *Hickman* factors).

No. 20-40811

## (1)

The first *Hickman* factor is whether "there is a valid contract between the parties."[14] The parties do not dispute the validity of the contracts in the record between Brand and Grand Isle, and between Grand Isle and BP. Therefore, the first *Hickman* factor weighs in Defendants' favor.

## (2)

The second *Hickman* factor is whether "the work being done is of an independent nature such that the contractor may employ non-exclusive means in accomplishing it."[15] At least one Louisiana court has held that this factor weighs against independent-contractor status when a worker is required to use specific tools.[16]

The second factor applies differently to each Defendant. No evidence supports that BP interfered with the means that Brand chose for constructing the scaffolding. Not so for Grand Isle. Grand Isle admitted in deposition that it "own[ed]" the tools that Brand "utiliz[ed]" to complete the scaffolding work: the "hammers," "wrenches," "safety harnesses," and "things like that." Grand Isle also stored these tools for Brand in "tool houses." On this evidence a reasonable jury could find that Grand Isle required Brand to use specific tools to complete the scaffolding work. Therefore, this factor weighs in BP's favor, but against Grand Isle's.

---

[14] *Carpenter*, 825 So. 2d at 1129.

[15] *Id.*

[16] *See Kibodeaux v. Progressive Ins. Co.*, 4 So. 3d 222, 226 (La. Ct. App. 2009) (noting that an inspector "would most likely not have been allowed to substitute his own badge or his own inspection cards, in place of those provided").

No. 20-40811

(3)

The third *Hickman* factor is whether "the contract calls for specific piecework as a unit to be done according to the independent contractor's own methods, without being subject to the control and direction of the principal, except as to the result of the services to be rendered."[17] Still, principals may exercise control and direction over the end result of the work without creating an employer-employee relationship.[18] Further, Louisiana courts are reluctant to incentivize dangerous work practices by creating an employer-employee relationship based merely on workplace-safety standards.[19]

The third factor weighs in BP's favor. Coleman argues that BP's safety rules, on-the-platform supervision, and reporting requirements were so pervasive that BP effectively specified Grand Isle and Brand's work-performance standards. We disagree. No evidence supports that BP's general safety rules prescribed how Brand needed to build scaffolding.[20]

---

[17] *Carpenter*, 825 So. 2d at 1129. Louisiana courts have found that certain facts make this factor weigh against finding an independent-contractor relationship—for example, unilaterally specifying work-performance standards, work hours, and work location, *Kibodeaux*, 4 So. 3d at 226; *Simon v. Farm Bureau Ins. Co.*, 297 So. 3d 147, 152 (La. Ct. App. 2020), or causing workers to fear termination for non-compliance with any of these, *Simon*, 297 So. 3d at 152–53.

[18] *Carpenter*, 825 So. 2d at 1129.

[19] *See Davenport v. Amax Nickel, Inc.*, 569 So. 2d 23, 28 (La. Ct. App. 1990) ("Imposing liability based on that theory could lead to the absurd result of encouraging owners to ignore and condone safety violations by independent contractors in order to avoid liability.").

[20] Even if they did, it would take an exceptional case before workplace-safety rules could cause the third *Hickman* factor to weigh against an independent-contractor relationship. The law encourages workplace safety out on the OCS. Not vice-versa. *Id.*; *see also LeJune v. Shell Oil Co.*, 950 F.2d 267, 270 (5th Cir. 1992) (commenting that, under Louisiana law, "[t]he fact that a principal takes an active interest in the safety of the employees of its independent contractor does not, in and of itself, constitute direct

No. 20-40811

Further, BP was entitled to exercise direction and control over the end result of Brand's services through reporting requirements. Coleman also equates BP's control over transportation to and from the platform with specifying Brand's work hours. But the record reflects that BP did not make transportation decisions unilaterally. Brand decided when to work, and BP decided when to transport. Without more, we can only speculate that BP actually specified Brand's work hours. Because speculation cannot support a genuine fact dispute, this argument fails to persuade as well.[21]

The third factor also weighs in Grand Isle's favor. Despite Coleman pointing to Grand Isle's routine supervision on the platform, no evidence supports that Grand Isle ever prescribed how Brand needed to build scaffolding.

(4)

The fourth *Hickman* factor is whether "there is a specific price for the overall undertaking agreed upon."[22] The record and parties' arguments are unclear on how we should weigh this factor. We therefore hold that the fourth factor is neutral.

(5)

The fifth *Hickman* factor is whether "the duration of the work is for a specific time and not subject to termination or discontinuance at the will of either side without a corresponding liability for its breach[.]"[23] This factor

---

operational control." (quoting *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 193 (5th Cir. 1991))).

[21] *TIG*, 276 F.3d at 759.

[22] *Carpenter*, 825 So. 2d at 1129.

[23] *Id.* Here too, Louisiana courts have found that certain facts make this factor weigh against finding an independent-contractor relationship—for instance, if one party

No. 20-40811

weighs in both Defendants' favor. No evidence supports and Coleman does not argue that BP could unilaterally terminate Brand. Coleman does argue, though, that Grand Isle could. He quotes the Grand Isle–Brand contract: "[Grand Isle] may terminate any particular work or service being performed under this contract at any time at its sole discretion." Coleman contends that this clause is an at-will-termination-without-liability provision. We disagree. We construe contracts by reading them as a whole.[24] The contract's preceding sentence expressly provides that "termination" would not relieve either party "of its respective obligations and liabilities arising from or incident to work performed or services rendered." Simply put, Grand Isle could terminate the contract at will, but Brand would still have a claim for breach. Therefore, this clause is no evidence that Grand Isle could terminate Brand at will without incurring liability for breach.

\* \* \*

In sum, the *Hickman* factors weigh in favor of holding that Brand was Grand Isle and BP's independent contractor. For Grand Isle, the first, third, and fifth factors weigh in favor of an independent-contractor relationship. Only the second factor casts some doubt on that conclusion. But standing alone, that one factor in this case is not enough for a reasonable jury to return a verdict that Brand was Grand Isle's employee. The answer is even clearer for BP. No factor casts doubt on Brand's status as BP's independent contractor. Therefore, a reasonable jury could not return a verdict that Brand was BP's employee either.

---

may unilaterally terminate the contract without liability for breach. *Simon*, 297 So. 3d at 155–56.

[24] *Ogea v. Loffland Bros. Co.*, 622 F.2d 186, 189 (5th Cir. 1980) (declining to adopt a contractual interpretation that "would ignore the well-recognized principle under Louisiana law that [a] contract must be viewed as a whole" (citation omitted)).

No. 20-40811

B

Coleman's second vicarious-liability theory is that even if Brand was an independent contractor, Defendants are still vicariously liable because they exercised operational control over Brand. Though the independent-contractor rule generally bars vicarious liability, some exceptions apply. One is the operational-control exception. As we have recognized before, when a principal either "retains"[25] or "exercises" operational control over the independent contractor's acts, then the principal remains vicariously liable.[26] Retention and actual exercise of control do not weigh equally. We clarified in *Echeverry v. Jazz Casino Co.* that contractual retention weighs heavier.[27] The district court found that the operational-control exception did not apply as to either BP or Grand Isle. Coleman disputes this on two fronts. He attacks both the standard that the district court used and its application. We agree with the district court.

(1)

Coleman argues that the district court applied too-narrow a standard in deciding operational control. Coleman argues that operational control exists anytime a principal does not give an independent contractor "complete" or "*absolute freedom* to perform work as [it] deem[s] fit."

Coleman's standard is much too broad. The district court faithfully applied the operational-control standard that we have articulated before:

---

[25] *Graham*, 21 F.3d at 645.

[26] *Bartholomew v. CNG Producing Co.*, 832 F.2d 326, 329 (5th Cir. 1987).

[27] *See* 988 F.3d 221, 232 (5th Cir. 2021) ("The supervision and control that is actually exercised by the principal is less important than the right to control that is contractually reserved."); *see also Sandbom v. BASF Wyandotte, Corp.*, 674 So. 2d 349, 354 (La. Ct. App. 1996) ("The decisive element is whether the principal has retained the right of direct supervision of the step-by-step process of accomplishing the work.").

Operational control requires evidence of "direct supervision" by the principal "over the step-by-step process of accomplishing the work."[28] That standard is not met merely because the principal contractually retained general rights—for example, the right to "order the work stopped or resumed," "inspect its progress," "receive reports,"[29] or demand that an independent contractor develop and implement safety procedures.[30] Neither is that standard met merely because a principal keeps a representative physically present at the jobsite to ensure compliance with the contract.[31]

Therefore, we disagree with Coleman's operational-control-exception formulation. The district court got the standard right.

(2)

Coleman further contends that he raised a fact dispute under the operational-control standard. Applying the above standard, we disagree. Coleman argues that Defendants exercised operational control by giving Brand work priorities. But setting general work priorities does not prescribe the step-by-step process for building scaffolding. Coleman argues that BP and Grand Isle established operational control by requiring compliance with BP safety rules. But safety rules generally do not establish operational control as a matter of public policy. Coleman argues Grand Isle established

---

[28] *Fruge ex rel. Fruge v. Parker Drilling Co.*, 337 F.3d 558, 561 (5th Cir. 2003).

[29] *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 613 (5th Cir. 2018) (quoting *LeJune*, 950 F.2d at 270).

[30] *Duplantis*, 948 F.2d at 193; *see also Davenport*, 569 So. 2d at 28 (declining to hold that imposing safety procedures can create vicarious liability through the operational-control exception because it would "encourag[e] owners to ignore and condone safety violations by independent contractors in order to avoid liability").

[31] *Davenport*, 569 So. at 28 ("The fact that [the principal's] personnel may have pointed out obvious violations of safety rules and may have sought to have them corrected does not make [the principal] liable for the consequences of such violations.").

No. 20-40811

operational control by having on-site supervisors that determined the equipment to be issued and used. Even accepting this as true, this actual exercise of control is less weighty than what the Grand Isle-Brand contract provided: that Grand Isle would leave to Brand "the methods and details of performance, Grand Isle being interested only in the results obtained, and having no control over the manner and method of performance." Moreover, providing tools does not equate to giving step-by-step instructions on how to build scaffolding. Finally, Coleman argues that Defendants exercised operational control by directing or "influenc[ing]" Brand when to "begin its work." Even assuming they did, that falls squarely within a principal's general right to order the work stopped or resumed.

## C

Coleman's third vicarious-liability theory is that even if Brand was an independent contractor, then there is still a fact dispute over Defendants' vicarious liability under the unsafe-work-practices exception. When a principal "expressly or impliedly authorizes an unsafe practice," then the principal remains vicariously liable.[32] We agree with the district court: No genuine dispute of material fact exists on this issue.

---

[32] *Bartholomew*, 832 F.2d at 329 (quoting *Ewell v. Petro Processors of La., Inc.*, 364 So. 2d 604, 606–07 (La. Ct. App. 1978)). Our cases have sometimes referred to the unsafe-work-practices exception collectively with the operational-control exception. *See, e.g.*, *Voces v. Energy Res. Tech., G.O.M., L.L.C.*, 704 F. App'x 345, 349 (5th Cir. 2017) (per curiam) (labeling both "the operational control exception"). We note, however, that both are distinguishable exceptions to the independent-contractor rule under Louisiana law, complete with bespoke inquiries.

No. 20-40811

(1)

We recently explained in *Echeverry* that the unsafe-work-practices exception applies only when the principal "expressly or impliedly authorized the *particular manner*" which rendered the work unsafe.[33] Observing but failing to object to an unsafe work practice does not create a fact dispute.[34] And if the independent contractor "participated" in deciding to use the unsafe work practice, that also "weighs heavily against" finding a fact dispute.[35] Still, defining the unsafe work practice is no easy task. It first "requires determining at what level of generality to view the work practice."[36] That means "start[ing] with the underlying action" and then "add[ing] some specifics of the occasion."[37]

The parties disagree about what the unsafe work practice was. Coleman contends that it was "[p]erforming scaffolding work in inclement weather." The inclement weather being the "dangerous wind speeds" that day. Grand Isle appears to accept Coleman's framing, but BP does not. BP contends that the unsafe work practice was "using a scaffolding board on an offshore platform" and then "carrying [it] in gusting winds."

Our decision in *Echeverry* is instructive in deciding between the parties' competing definitions. In *Echeverry,* a casino hired a wildlife-removal company to remove birds from palm trees. The removal company injured a

---

[33] *Echeverry*, 988 F.3d at 233 (quoting *Davis v. Dynamic Offshore Res., L.L.C.*, 865 F.3d 235, 236 (5th Cir. 2017)).

[34] *See id.* ("A company man's observing and failing to object to the independent contractor's unsafe work practices is insufficient evidence of authorization to defeat a motion for summary judgment.").

[35] *Id.*

[36] *Id.*

[37] *Id.* at 234.

pedestrian that was standing at a crosswalk by running her over with the manlift it was using for the work. The "flagman" had failed to alert her to its approach.[38] Under those facts, the underlying action was "using a manlift."[39] After adding occasion specifics, the unsafe work practice became "moving a manlift against vehicular traffic at a busy intersection when there was substantial pedestrian traffic."[40]

Using *Echeverry* as our guide, we agree with BP's formulation. Specifically, the underlying action in *Echeverry* tracked the instrumentality that caused injury (the manlift) and not the work's overall purpose (bird removal). Here the work's purpose was to build scaffolding. But the instrumentality that caused Coleman's injury was the scaffolding board. As for the occasion specifics, in *Echeverry* we focused on what specifically made the underlying action unsafe: using a manlift "against vehicular traffic"; "at a busy intersection"; and while "there was substantial pedestrian traffic."[41] Here what specifically made using a scaffolding board unsafe was using it on an offshore platform while winds were gusting. Therefore, we agree with BP's unsafe-work-practices articulation: carrying scaffolding boards on an offshore platform in gusting winds.

(2)

No evidence supports that Defendants expressly or impliedly authorized Coleman to carry scaffolding boards on an offshore platform in gusting winds. Coleman points to how BP transferred him to the platform in an overloaded personnel basket in wind speeds exceeding BP's safety rules,

---

[38] *Id.* at 227.

[39] *Id.* at 234.

[40] *Id.*

[41] *See id.*

No. 20-40811

and that Defendants had a pecuniary motive to resume work after a multi-day work stoppage. However Coleman got to the platform and whatever Defendants' motives at the time, though, we have already discussed how Brand retained control over deciding when to work. And the record is clear: Brand chose to build scaffolding that day despite the wind speeds. Even if Defendants "influenced" that decision, Brand's participation in it weighs heavily against finding a genuine fact dispute. And once the work started, that BP and Grand Isle supervisors stood by and did nothing to stop Brand cannot create a fact dispute either.

## IV

Coleman contends that even if the independent-contractor rule bars holding Defendants vicariously liable for his injuries, then each is still directly liable for its own negligence. Adopting Louisiana law, we have explained before that a principal owes "no duty" to its independent contractors "to provide a safe work place."[42] But the no-duty rule does not apply when the principal either affirmatively assumes that duty[43] or creates a workplace hazard.[44] Coleman contends that a fact dispute exists for both exceptions. The district court disagreed. We agree with the district court.

---

[42] *Graham*, 21 F.3d at 647.

[43] *Cf. id.* (recognizing that a principal can "assume an ex-contract duty to provide a safe work place," but rejecting that the principal had in that case).

[44] *Cf. Zephrin v. Conoco Oil Co., Inc.*, 884 F.2d 212, 213 (5th Cir. 1989) ("This court has consistently held . . . that a principal . . . who hires an independent contractor, over which it exercises no operational control, has no duty to remedy hazards created by its independent contractors." (citations omitted)).

A

For a principal to affirmatively assume a duty to provide its independent contractors with a safe workplace, it must do more than merely observe unsafe work habits.[45] That *more* can be met, though, when the principal "voluntarily and affirmatively" goes beyond the contract to "reprimand[] the independent contractor for various safety violations."[46] The key, however, is that the injury must be caused by induced reliance on the principal's safety rules. Merely providing general safety rules is not enough.[47] Applying this standard, no evidence supports that either Defendant assumed a duty to keep Coleman safe.

(1)

Coleman contends that a genuine fact dispute exists over whether BP assumed a duty towards him. We disagree. Coleman argues that BP assumed a duty by enforcing safety rules on the platform. But no evidence supports that these safety rules governed carrying scaffolding boards in gusting winds. Coleman argues that BP assumed a duty by stationing safety supervisors on the platform. But merely observing an unsafe work practice is not enough to assume a duty. Coleman argues that BP's safety supervisors had the authority to and actually did determine the "applicable" safety equipment used on the platform. No evidence supports that contention. The deposition Coleman cites to in support is actually for a *Grand Isle* employee, not a BP employee. Further, the BP-Grand Isle contract expressly provided that

---

[45] *Graham*, 21 F.3d at 648.

[46] *Id.*

[47] *See LeJune*, 950 F.2d at 271 ("Nothing in the record before us, however, indicates that LeJeune was painting the rack on some kind of reliance induced by the Manual.").

Grand Isle would "take full responsibility for the . . . safety of all its operations and methods necessary" to build the scaffolding.

(2)

Coleman also argues that Grand Isle assumed a duty towards him. We disagree with most of his arguments for many of the same reasons that we reject that BP assumed a duty. No evidence supports that Grand Isle enforced safety rules over carrying scaffolding boards in gusting winds. And Grand Isle did not assume a duty merely based on what its safety supervisors observed.

Admittedly, though, Grand Isle's safety supervisors were more involved than BP's in one respect—issuing safety equipment. Coleman points to how Grand Isle's employee admitted at deposition that its safety supervisors determined "all applicable equipment" to be "used" by Brand on the platform. But that does not matter here. At most it supports a reasonable inference that Grand Isle undertook a duty to issue Coleman safety equipment applicable for building scaffolding. But it would be unreasonable for a jury to conclude from this evidence that Grand Isle undertook a broader duty to protect Coleman from *all* hazards on the platform. In fact, the record directly contradicts such a broad proposition. In its contract with Grand Isle, Brand expressly warranted that its workers could perform the work "safely." Moreover, nothing in the record supports that some unspecified piece of non-issued equipment would have or could have prevented Coleman's injury. Therefore, Grand Isle's admission does not change our analysis.[48]

---

[48] *See Zervas v. Faulkner*, 861 F.2d 823, 836–37 (5th Cir. 1988) (equating an "overly attenuated chain of inferences" with "speculation and conjecture").

B

Coleman finally argues that Defendants were independently negligent because they created the hazard that injured him. We disagree. As we have already noted, a principal is not liable for injuries sustained by its independent contractor when the independent contractor "created" the hazard.[49] A principal does not create the hazard when it does not "control the operation of the particular activity during which the plaintiff was allegedly injured."[50] Simply put, a reasonable jury could not conclude on this evidence that Defendants *controlled* the hazard that Coleman alleges injured him: the decision to start working in high winds. Coleman argues that Defendants controlled the decision to start work since BP controlled the decision over when to transport Brand employees to the platform. But deciding when to transport is not the same thing as deciding when to start building scaffolding. And on that front, the record not only reflects that Brand independently decided that "now [is] the right time to [do] the work," but also that everyone on the platform had the authority to stop working if conditions were unsafe. While Coleman contends he feared for his job if he exercised his stop-work authority, no evidence supports that Brand harbored similar fears if it did.

V

As to these Defendants, the district court got it right—a reasonable jury could not conclude on this record that either Defendant is vicariously or directly liable for Coleman's back injury. Therefore, we AFFIRM the district court.

---

[49] *E.g.*, *Zephrin*, 884 F.2d at 213.

[50] *Id.*