# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 30, 2023

Lyle W. Cayce
Clerk

No. 21-20200

Kevion Rogers,

*Plaintiff—Appellant*,

*versus*

Jeffrey Jarrett; Jeremy Bridges; Texas Department of
Criminal Justice,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:19-CV-2330

Before Richman, *Chief Judge*, and Wiener and Willett, *Circuit Judges*.

Don R. Willett, *Circuit Judge*:

A trusted prison inmate was working unsupervised in a hog barn when the ceiling collapsed, striking him in the head. He told the prison agricultural specialist that he needed medical attention. But the specialist thought the inmate looked no worse for wear and ordered him back to work. A short while later, the inmate asked another prison staffer for medical attention. The staffer radioed a supervisor. Based on the staffer's report, the supervisor, too, thought nothing serious had happened and did not immediately grant the

No. 21-20200

request. The inmate's condition later worsened. He was sent to the hospital and diagnosed with a traumatic brain injury. The district court granted summary judgment to Defendants based on qualified immunity. For the reasons below, we AFFIRM.

I

Kevion Rogers was a trusted inmate. Prison staff let Rogers work unsupervised and outside the prison's security fence. Rogers's daily job was to help take care of the prison's hogs. One day Rogers went into one of the prison's hog barns looking for a powder used to keep baby hogs healthy. As he was leaving, part of the barn's ceiling collapsed and hit him on the head. Rogers blacked out.

After he came to, another inmate took Rogers to see the prison's staff agricultural specialist, Jeffrey Jarrett. Rogers walked normally into Jarrett's office. And though Rogers "had dust on him," his only visible injury was a scraped knee. An agitated Rogers demanded "to go to the infirmary." But from Jarrett's perspective, Rogers "looked fine." Rogers didn't "look hurt," and spoke without a slur. Jarrett told Rogers to keep looking for the powder. Rogers walked normally out of the office. He did not see Jarrett again that morning. Jarrett's job responsibilities took him away from the prison to another unit.

Rogers tried to go on about his business. But he was "lightheaded" and had to sit down. Other inmates tried to keep him awake as he drifted "in and out of consciousness." Soon after another prison staffer arrived to get the inmates ready for lunch. Rogers told the staffer that "the ceiling collapsed on [his] head" and showed the staffer the "debris." Rogers again asked for medical attention. The staffer radioed Jarrett's supervisor, Jeremy Bridges, and informed him "that the ceiling had fallen on [Rogers's] head and that [Rogers] had sustained a head injury." Bridges radioed back to take Rogers

2

"back to [his] bunk" so Bridges could "take a look at [him] later." But Rogers objected—he still wanted "to go eat lunch." Rogers's objection made Bridges think whatever injuries Rogers had were not "serious." Bridges radioed back that going to lunch was fine. He'd be out to check on Rogers "soon."

For whatever reason though, Rogers was still brought back to his bunk. By the time he reached his dormitory his condition had begun to deteriorate. His head and eyes had begun to swell, his face was bruising, and he was showing signs of respiratory distress. Prison staff at the dormitory thought this was "abnormal," and so Rogers was redirected to the prison's administrative building. He collapsed on the way there, began to "seize violently," and started "vomiting." Rogers "lost consciousness." Within minutes prison staff at the administrative building summoned medical assistance. Emergency medical services evacuated Rogers to a nearby hospital by helicopter. Hospital staff diagnosed Rogers with a "traumatic brain injury; no hemorrhage."[1]

Rogers sued Jarrett, Bridges, and the Texas Department of Criminal Justice in Texas state court. Under 42 U.S.C. § 1983, Rogers alleged that prison staff violated his Eighth and Fourteenth Amendment rights by acting with deliberate indifference towards him. Under the Texas Tort Claims Act, Rogers alleged premises-liability claims. Defendants removed the case to federal court and moved for summary judgment on all claims. The district court granted summary judgment to Defendants on Rogers's § 1983 claims, declined to exercise supplemental jurisdiction over his TTCA claims, and remanded the case to state court. Rogers timely appealed. He argues that

---

[1] Hospital staff released Rogers back to the prison the next day with prescriptions for pain and anti-nausea medication. The district court found "no evidence in the record of subsequent problems or complications."

No. 21-20200

Jarrett and Bridges were deliberately indifferent towards his serious medical needs and thus not entitled to qualified immunity.[2]

## II

We review summary judgment de novo.[3] Courts may grant summary judgment on an issue only when "no genuine dispute as to any material fact" exists "and the movant is entitled to judgment as a matter of law."[4] A fact dispute is "genuine" if "a reasonable jury could return a verdict for [the nonmovant] based on the evidence."[5] "[W]e must view all evidence and draw all justifiable inferences in favor of [Rogers], the nonmovant."[6] Still, "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation" do not count for raising a genuine fact dispute.[7]

---

[2] Rogers was represented by counsel in the district court and here. He also argued in the district court that Defendants were deliberately indifferent towards his safety by having him work in the hog barn. He did not raise that theory in his opening brief. Likewise, Rogers raised no claims against TDCJ in his opening brief. He also did not raise the district court's refusal to exercise supplemental jurisdiction. It is not our role to "raise and discuss legal issues that [a party] has failed to assert" on appeal. *Brinkmann v. Dall. Cnty. Deputy Sheriff Abner*, 813 F.2d 744, 748 (5th Cir. 1987). So Rogers has abandoned those issues and arguments. *Id.*

[3] *Batiste v. Lewis*, 976 F.3d 493, 500 (5th Cir. 2020).

[4] *Id.* (quoting *Rogers v. Bromac Title Servs., L.L.C.*, 755 F.3d 347, 350 (5th Cir. 2014)).

[5] *Coleman v. BP Expl. & Prod., Inc.*, 19 F.4th 720, 726 (5th Cir. 2021).

[6] *Id.*

[7] *Id.* (quoting *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)).

III

Rogers contends that the district court improperly granted Jarrett and Bridges qualified immunity. We have explained before that plaintiffs bear the "burden" to "demonstrate the inapplicability of the defense."[8] And Rogers had to meet that burden for *each* defendant.[9] That means Rogers had to (1) raise a fact dispute on whether his constitutional rights were violated by the defendants' individual conduct, and (2) show those rights were "clearly established at the time of the violation."[10] On this record, Rogers failed to meet either prong.

A

Rogers contends that he raised a fact dispute on a constitutional violation. He argues that both Jarrett and Bridges acted with deliberate indifference towards his serious medical needs, violating his Eighth Amendment rights in the process. But "[d]eliberate indifference is an extremely high standard to meet."[11] As the Supreme Court has explained, Rogers needed to raise a fact dispute on whether Jarrett and Bridges were each "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and actually "dr[ew] the inference."[12] And *serious* harm isn't just any harm. Rogers's medical need

---

[8] *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc) (per curiam).

[9] *See Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983) ("Personal involvement is an essential element of a civil rights cause of action.").

[10] *See Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).

[11] *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001).

[12] *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999) (explaining that prison officials act with deliberate indifference only

had to be "so apparent that even laymen would recognize that care is required."[13] The district court found "no evidence that would permit a jury to infer that Jarrett and Bridges had subjective knowledge of the severity of Rogers's condition." We agree with the district court.

A reasonable jury could not conclude on this record that either Jarrett or Bridges actually inferred that Rogers was at substantial risk of serious harm. As the district court noted, the record supports that both Jarrett and Bridges knew that Rogers had been hit in the head. But as recounted above, Jarrett did not perceive any apparent injury to Rogers other than a scraped knee. From Jarrett's perspective, Rogers was "look[ing] alright" and "[didn't] look hurt." Rogers "had dust on him," but did not have visible injuries, did not slur his speech, and walked normally into and out of Jarrett's office. The same goes for Bridges. All he knew about Rogers's injuries was what he'd been told over the radio: that Rogers "had sustained a head injury" after a ceiling collapse. But Bridges testified that he did not think it was a particularly severe injury since Rogers had requested "to go eat lunch" while he waited for Bridges to come see him. Indeed, Rogers did not develop severe symptoms—seizures, vomiting, and loss of consciousness—until later on. And once he did, prison staff rendered medical aid within minutes.

Rogers disagrees. He argues that fact disputes over what happened preclude summary judgment; that the district court misapplied the deliberate-indifference standard; and that Supreme Court and our caselaw compel a contrary conclusion. We are unconvinced.

---

when they "*know*[] *of and disregard*[] an excessive risk to inmate health or safety" (quoting *Farmer*, 429 U.S. at 837)).

[13] *See Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006).

*First*, Rogers argues "that there is a genuine issue of material fact in dispute as to *what actually happened* on the morning of the incident," precluding summary judgment under our decisions. But the district court analyzed Rogers's claim under his version of events. And Jarrett and Bridges do not dispute what they knew when. Rather, the only dispute on appeal is what *inferences* Jarrett and Bridges drew from what they knew. Because the inferences Rogers asks us to make are speculative, this argument fails.[14]

*Second*, Rogers argues that the district court misapplied the deliberate-indifference standard. In Rogers's view, "the ultimate question" that his claim turns on is "was [he] exposed to a 'substantial risk of serious harm'"? But that misstates the standard. It is not enough for Rogers to have raised a fact dispute on whether Jarrett and Bridges "actually drew the inference that [a] *potential* for harm existed," as Rogers argues. The Supreme Court was clear in *Farmer v. Brennan*: "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."[15] We have likewise been clear: "[L]iability attaches only if [officials] actually knew—not merely should have known—about the risk."[16] Bottom line: Mere negligence is not enough.

*Third*, Rogers misreads Supreme Court and circuit caselaw. "[T]he takeaway" from the Supreme Court's decision in *Estelle v. Gamble*[17] is not that nonphysician prison staff are "expected to allow prisoners to consult medical experts because they themselves are not qualified to diagnose or

---

[14] *Coleman*, 19 F.4th at 726.

[15] 511 U.S. at 838.

[16] *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 528 (5th Cir. 1999).

[17] 429 U.S. 97 (1976).

treat . . . medical condition[s]," as Rogers suggests. The takeaway is that courts must "separately consider" the allegations against physician and nonphysician staff alike when deciding deliberate-indifference claims.[18] And our decision in *Austin v. Johnson*[19] adds little, if anything, to support Rogers's claims. Rogers admits that his case is "unlike" *Austin* because neither Jarrett nor Bridges "failed to get medical treatment for [him] after [seeing] his conditions worsening."[20]

B

In sum, Rogers failed to raise a fact dispute over whether Jarrett and Bridges acted with deliberate indifference. But even if he had, he'd still need to show that his rights were "clearly established at the time of the violation."[21] As we have explained many times, that takes showing that "the violative nature of *particular* conduct is clearly established."[22] It just isn't enough to identify a right as "a broad general proposition."[23] The district court did not address qualified immunity's second step. Jarrett and Bridges argue, though, that even assuming a violation, the law was not clearly established under this standard. We agree with Jarrett and Bridges.

---

[18] *See id.* at 108 ("The Court of Appeals focused primarily on the alleged actions of the doctors, and did not separately consider whether the allegations against the [nonphysician defendants] stated a cause of action.").

[19] 328 F.3d 204 (5th Cir. 2003).

[20] *See id.* at 210 (holding that "failure to call an ambulance for almost two hours while [a minor] lay unconscious and vomiting" after an afternoon of forced exercise "rises to the level of deliberate indifference").

[21] *Brown*, 623 F.3d at 253.

[22] *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).

[23] *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).

In barely half a page of briefing Rogers argues that the Supreme Court's decision in *Estelle* "clearly established [the] law govern[ing] the substance of this entire dispute." But the only right Rogers identifies as being violated was his right to be free from deliberate indifference towards his serious medical needs. That generalized proposition of law is not enough. The Supreme Court has articulated an exacting standard. Rogers needed to point to "a case or body of relevant case law in which an officer acting under similar circumstances was held to have violated the Constitution."[24] And *Estelle* just isn't that case. The Supreme Court *reversed* us in *Estelle* that the doctors had acted with deliberate indifference towards the prisoner.[25] And on remand, we held that the nonphysician prison staff likewise didn't act with deliberate indifference.[26] Therefore, we cannot agree with Rogers that he has shown that Jarrett and Bridges violated clearly established law.

For the first time at oral argument, though, Rogers's counsel argued that our recent decision in *Sims v. Griffin*[27] supports that Jarrett and Bridges violated clearly established law. "[W]e cannot and will not consider arguments raised for the first time at oral argument."[28] Under the Rules of Appellate Procedure, Counsel should have advised us of any "pertinent and significant authorities" that had come to his attention after briefing had concluded "*by letter*."[29] But even had Rogers's counsel filed that letter, *Sims* is not the helpful precedent he thinks it is.

---

[24] *Batyukova v. Doege*, 994 F.3d 717, 726 (5th Cir. 2021) (cleaned up).

[25] 429 U.S. at 107–08.

[26] 554 F.2d 653, 653–54 (5th Cir. 1977) (per curiam).

[27] 35 F.4th 945 (5th Cir. 2022).

[28] *Jackson v. Gautreaux*, 3 F.4th 182, 188 n.* (5th Cir. 2021).

[29] *See* FED. R. APP. P. 28(j) (emphasis added).

All we recognized in *Sims* was what had already been clearly established in our circuit: "[A] prisoner can show his clearly established rights under the Eighth Amendment were violated if a prison official 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any *serious medical needs*.'"[30] We have held officials liable for violating that standard before, including when the record supported that they:

- "offered no treatment options to a patient with a history of cardiac problems who was experiencing severe chest pains;"[31]

- "knew [a prisoner] had swallowed a bag full of drugs, vomited multiple times, screamed for help, pleaded to go to the hospital, and had steadily deteriorated since his arrival at the jail;"[32] and

- personally witnessed a prisoner's head being struck "repeatedly," causing him to go "unconscious."[33]

Rogers, though, would have us read these cases as clearly establishing that *any* report of *any* strike to a prisoner's head is enough to trigger a duty for officials to seek advanced medical care for the prisoner. They do not. No reasonable official would read them that way, and so we disagree with Rogers's formulation of clearly established law.[34]

---

[30] 35 F.4th at 951 (quoting *Easter v. Powell*, 467 F.3d 459, 465 (5th Cir. 2006) (per curiam)) (emphasis added).

[31] *Easter*, 467 F.3d at 465.

[32] *Sims*, 35 F.4th at 952.

[33] *Moore v. LaSalle Mgmt. Co.*, 41 F.4th 493, at 502 (5th Cir. 2022).

[34] *See Buehler v. Dear*, 27 F.4th 969, 981 (5th Cir. 2022) ("Although the plaintiff need not identify 'a case *directly* on point' in order to make such a showing, he or she must point to 'authority at a sufficiently high level of specificity to put a reasonable official on

No. 21-20200

## IV

What happened to Rogers was unfortunate. Maybe it was negligent. But was it the product of deliberate indifference? Not on this record. And even if it were, these officials did not violate clearly established law on these facts. Bound by our controlling immunity precedent, we AFFIRM.

---

notice that his conduct is definitively unlawful.'" (quoting *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015)).

No. 21-20200

DON R. WILLETT, *Circuit Judge*, concurring:

Today's decision upholding qualified immunity is compelled by our controlling precedent. I write separately only to highlight newly published scholarship that paints the qualified-immunity doctrine as flawed—foundationally—from its inception.[1]

For more than half a century, the Supreme Court has claimed that (1) certain common-law immunities existed when § 1983 was enacted in 1871,[2] and (2) "no evidence" suggests that Congress meant to abrogate these immunities rather than incorporate them.[3] But what if there *were* such evidence? Indeed, what if the Reconstruction Congress had explicitly stated—right there in the original statutory text—that it was nullifying all common-law defenses against § 1983 actions? That is, what if Congress's literal language unequivocally negated the original interpretive premise for qualified immunity? Professor Alexander Reinert argues precisely this in his new article, *Qualified Immunity's Flawed Foundation*—that courts have been construing the wrong version of § 1983 for virtually its entire legal life.

Wait, what?

---

[1] Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 CAL. L. REV. 201 (2023) ("This Article takes aim at the roots of the doctrine—fundamental errors that have never been excavated.").

[2] *Pierson v. Ray*, 386 U.S. 547, 556–57 (1967) (tethering qualified immunity to common-law defenses that existed circa 1871, like subjective good faith). Professor William Baude has challenged this historical premise—forcefully and methodically—arguing that qualified immunity departs significantly from traditional common-law principles. *See* William Baude, *Is Qualified Immunity Unlawful?*, 106 CAL. L. REV. 45, 49–60 (2018). Professor Joanna Schwartz likewise questions the doctrine's origins, contending there were no common-law immunities. *See* Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 NOTRE DAME L. REV. 1797 (2018).

[3] *Briscoe v. Lahue*, 460 U.S. 325, 337 (1983) ("[W]e find no evidence that Congress intended to abrogate the traditional common-law . . . immunity in § 1983 actions.").

No. 21-20200

As passed by the Reconstruction Congress, Section 1 of the Civil Rights Act of 1871 (now colloquially known as § 1983) read this way:

> [A]ny person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, *any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding,* be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress . . . .[4]

The italicized language—the "Notwithstanding Clause," as Professor Reinert calls it—explicitly displaces common-law defenses.[5] The language that Congress passed makes clear that § 1983 claims are viable notwithstanding "any such law, statute, ordinance, regulation, custom, or usage of the State to contrary." The language is unsubtle and categorical, seemingly erasing any need for unwritten, gap-filling implications, importations, or incorporations. Rights-violating state actors are liable—period—*notwithstanding* any state law to the contrary.

Then things went off the rails, quickly and stealthily. For reasons lost to history, the critical "Notwithstanding Clause" was inexplicably omitted from the first compilation of federal law in 1874.[6] The Reviser of Federal

---

[4] Civil Rights Act of 1871, ch. 22, § 1, 17 Stat. 13 (1871).

[5] Reinert, *supra* at 235 and n.230 (observing that "this clause meant to encompass state common law principles," noting that this understanding—that "custom or usage" was synonymous with common law—was, "after all," why the Court overruled *Swift v. Tyson*, 41 U.S. 1 (1842), in *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), and also citing *W. Union Tel Co. v. Call Pub. Co.*, 181 U.S. 92, 102 (1901), which in turn cites BLACK'S LAW DICTIONARY for the proposition that common law derives from "usages and customs").

[6] Reinert, *supra* at 207, 237.

Statutes made an unauthorized alteration to Congress's language. And that error was compounded when the various revised statutes were later published in the first United States Code in 1926. The Reviser's error, whether one of omission or commission, has never been corrected. Today, 152 years after Congress enlisted the federal courts to secure Americans' constitutional rights, if one were to Google "42 U.S.C. § 1983," the altered version that pops up says nothing about common-law defenses. According to Professor Reinert, that fateful, unexplained omission means that courts and scholars have never "grappled" with the Notwithstanding Clause's significance.[7]

All to say, the Supreme Court's original justification for qualified immunity—that Congress wouldn't have abrogated common-law immunities absent explicit language—is faulty because the 1871 Civil Rights Act *expressly included such language*. Those sixteen lost words, by presumably encompassing state common-law principles, undermine the doctrine's long-professed foundation and underscore that what the 1871 Congress meant for state actors who violate Americans' federal rights is not immunity, but liability—indeed, liability *notwithstanding* any state law to the contrary.[8]

---

[7] *Id.* at 236, 244.

[8] Beyond excavating the long-lost text of what the Reconstruction Congress actually passed, Professor Reinert asserts a second fundamental misstep: qualified immunity is rooted in a flawed application of the checkered "Derogation Canon." This canon of statutory interpretation urges that statutes in "derogation" of the common law should be strictly construed. The Court misapplied this canon, says Professor Reinert, reading § 1983's silence regarding immunity as implicit *adoption* of common-law immunity defenses rather than *rejection* of them. *Id.* at 211 n.56 (collecting cases). Professor Reinert maintains that the Derogation Canon has always rested on shaky ground, with Justice Scalia, writing with lexicographer Bryan Garner, branding it "a relic of the courts' historical hostility to the emergence of statutory law." *Id.* at 218 (citing Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 318 (2012)). Even more importantly, Reconstruction-era legislators would

These are game-changing arguments, particularly in this text-centric judicial era when jurists profess unswerving fidelity to the words Congress chose. Professor Reinert's scholarship supercharges the critique that modern immunity jurisprudence is not just *a*textual but *counter*textual. That is, the doctrine does not merely *complement* the text—it brazenly *contradicts* it.

In arguing that qualified immunity is flawed from the ground up, Professor Reinert poses a provocative question: "If a legislature enacts a statute, but no one bothers to read it, does it still have interpretive force?"[9] It seems a tall order to square the modern qualified-immunity regime with Congress's originally enacted language. But however seismic the implications of this lost-text research, "'[a]s middle-management circuit judges,' we cannot overrule the Supreme Court."[10] Only that Court can definitively grapple with § 1983's enacted text and decide whether it means what it says—and what, if anything, that means for § 1983 immunity jurisprudence.[11]

---

not have understood the canon as operating to dilute § 1983 by implying common-law defenses. Why? Because since the Founding era, the Supreme Court had only used the Derogation Canon (criticized by mid-nineteenth courts and treatises for arrogating power to judges) to protect preexisting common law *rights*, never to import common law *defenses* into new remedial statutes. Reinert, *supra* at 221–28. In short, the Derogation Canon does not validly apply to defenses. The more applicable canon, around which Reconstruction-era courts *had* coalesced, was a contrary one: remedial statutes—such as § 1983—should be read broadly. *Id.* at 219, 227–28. In any event, as argued above, even if the Derogation Canon *did* apply to defenses, the as-passed language of § 1983 explicitly displaced any existing common-law immunities.

[9] *Id.* at 246.

[10] *Sims v. Griffin*, 35 F.4th 945, 951 n.17 (5th Cir. 2022) (quoting *Whole Woman's Health v. Paxton*, 978 F.3d 896, 920 (5th Cir. 2020) (Willett, J., dissenting), *rev'd en banc*, 10 F.4th 430 (5th Cir. 2021)).

[11] Not all Supreme Court Justices have overlooked the Notwithstanding Clause. In *Butz v. Economou*, the Court quoted the as-passed statutory language, including the Notwithstanding Clause, yet, in the same breath, remarked that § 1983's originally enacted

No. 21-20200

---

text "said nothing about immunity for state officials." 438 U.S. 478, 502–03 & n.29 (1978) (citing *Pierson v. Ray*, 386 U.S. 547 (1967), *Imbler v. Pachtman*, 424 U.S. 409 (1976), and *Scheuer v. Rhodes*, 416 U.S. 232 (1974)). Indeed, members of the Supreme Court have often noted the Notwithstanding Clause's existence and omission from the U.S. Code. *See Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 510 (1939); *Monroe v. Pape*, 365 U.S. 167, 228 (1961) (Harlan, J., concurring); *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 203 n.15 (1970) (Brennan, J., concurring); *see also Screws v. United States*, 325 U.S. 91, 99 n.8 (1945) (quoting the originally enacted text, including the Notwithstanding Clause); *Monroe*, 365 U.S. at 181 n.27 (majority) (same); *Examining Bd. of Eng'rs, Architects, & Surveyors v. Flores de Otero*, 426 U.S. 572, 582 n.11 (1976) (same); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691–92 (1978) (same); *Chapman v. Hous. Welfare Rights Org.*, 441 U.S. 600, 608 n.15 (1979) (same); *Briscoe v. LaHue*, 460 U.S. 325, 357 n.17 (1983) (Marshall, J., dissenting) (same); *Wilson v. Garcia*, 471 U.S. 261, 262 n.1 (1985) (same); *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 723 (1989) (same); *Ngiraingas v. Sanchez*, 495 U.S. 182, 188 n.8 (1990) (same).