# Supreme Court of Texas

══════════

No. 22-1074

══════════

City of Houston,

*Petitioner*,

v.

Catrennia Foreman Sauls, Individually and as Representative of
the Estate of Dwayne Foreman, Deceased; and
Tristena Christian, as Next Friend of D.F., a Minor,

*Respondents*

══════════════════════

On Petition for Review from the
Court of Appeals for the Fourteenth District of Texas

══════════════════════

**Argued January 31, 2024**

JUSTICE DEVINE delivered the opinion of the Court.

In this interlocutory appeal, we decide whether the City of Houston is immune from a wrongful-death suit after its police officer, while responding to a suicide call, had an automobile accident with a bicyclist crossing the road. When police officers perform discretionary duties in good faith while acting within the scope of their authority, the

law shields the officers and their government employers from civil suit.[1] The court of appeals held that a fact issue on the officer's good faith precluded summary judgment.[2] We disagree and conclude that, as a matter of law, the officer was (1) performing a discretionary duty while acting within the scope of his authority in responding to the emergency call and (2) acting in good faith, given that a reasonably prudent officer in the same or similar circumstances could have believed the actions were justified. We reverse and render judgment dismissing the case.

## I. Background

On the evening of October 8, 2019, Officers Hewitt and Curtis were patrolling their assigned beat for the Houston Police Department. While they were on "call-out status" for an approved meal break at the police station, the City's 911 line received a call around 8:50 p.m. "regarding a suicide in progress" nearby. Patrol officers do not receive 911 calls directly, and Hewitt averred that he was not privy to this one.

The 911 dispatcher classified the call as priority two,[3] which is considered an emergency involving "in-progress property crimes and/or a potential threat to human welfare"—usually, a "threat to life." Priority two calls assume that if the crime or threat is not in progress,

---

[1] *See* TEX. CIV. PRAC. & REM. CODE § 101.021(1); *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653, 658 (Tex. 1994).

[2] 654 S.W.3d 772, 781-85 (Tex. App.—Houston [14th Dist.] 2022).

[3] The City's 911 call takers and dispatchers record and relay 911 information to police officers, including through a mobile data terminal in an officer's patrol car. The 911 dispatcher ensures the priority classification is done properly. Only supervisors are authorized to change the priority, which Hewitt was not.

2

the event recently occurred or response to the scene is urgent. After receiving a priority two call, the dispatcher has five minutes to dispatch it to an officer, and the officer then has five minutes to respond.[4] But unless the call is priority one, the dispatcher will bypass those officers who are on call-out status. Here, at 8:56 p.m., the dispatcher placed the priority two call on hold.

When the officers returned to their cruiser around 9:05 p.m., they received the dispatch call slip on their cruiser's mobile data terminal.[5] The call slip stated "suicide/jst occ/no wpn" with the following message: "Remarks Yes, I am trying to kill myself or harm someone else[.] No—there are not weapons involved[.] PT is not on her medication . . . and is out of control."[6] According to Hewitt, the dispatcher also alerted them that (1) there "was a suicide in progress with a female patient that was irate, destroying property, and had a knife"; and (2) "the call had already been holding for 10 minutes," so their response as the primary responding unit "was very urgent." The Department's standard response to a priority two call is without

---

[4] These response times are provided in a Department general order.

[5] In the "Pending Events" report taken from the mobile data terminal, the call is listed as the only priority two event and the highest priority call that was pending at that time.

[6] (All caps removed.) In greater detail, the call slip message reads:

E SUICID/JST OCC/NO WPN/CIT PNE 8C30 455T . . . HOUSE IN THE BACK 20:54 REMARKS YES, I AM TRYING TO KILL MYSELF OR HARM SOMEONE ELSE NO—THERE ARE NOT WEAPONS INVOLVED PT IS NOT ON HER MEDICATION . . . AND IS OUT OF CONTROL . . . . 20:57 REMARKS CALLER STS THAT PT NEED TO XFRD TO BENTAUB . . . 20:56 HOLD EVENT HELD FOR UNIT: E

emergency lights or sirens, but the officer may "get on the radio and ask . . . to use lights and sirens based on the[] circumstances" if they clearly warrant it. To avoid agitating the patient and consistent with his general approach for responding to priority two suicide calls, Hewitt did not turn on his cruiser's emergency equipment.[7]

Although roadside lighting was dark, traffic was fairly light with clear weather and dry roads. Exiting the station, Hewitt turned right, stopped at a red light for thirty seconds, and then proceeded southbound on North Wayside. North Wayside has two southbound lanes, a center median with some trees separating the northbound and southbound lanes, and a speed limit of 40 miles per hour. Given the call's nature and how long it had been holding, Hewitt accelerated to 62 miles per hour while traveling in the left lane next to the median as he approached Ritz Street. Seconds before reaching the intersection, Hewitt turned on his body camera.

At the same time, Dwayne Foreman was bicycling on Ritz with no reflectors or lights. Ritz intersects North Wayside from the east, and North Wayside has an opening in the median at the intersection with a

---

[7] In an affidavit, Hewitt noted that he had "responded to many priority two calls for service regarding a suicide in progress." He explained:

> These people are typically in crisis; if they are on the incline of their crisis, they tend to be more profoundly aggressive and irate. If they are on the decline of their crisis, it can be easier to calm them down, help them understand you are there to help, and work to get them help. That is why I do not respond with lights and sirens when responding to a priority two call for service regarding a suicide in progress; emergency lights and sirens can agitate the patient and put them on the defensive rather than understanding officers are there to help.

turn lane but no stop sign. A person coming from Ritz across North Wayside's northbound lanes and through the median's opening would be required to yield the right-of-way to southbound traffic. As Hewitt approached, Foreman was traversing the median's opening from the east on Hewitt's left side. Curtis said "watch this guy" three times, but the cruiser's A-pillar[8] and trees in the median prevented Hewitt from seeing Foreman until it was too late. Foreman was just beginning to turn southbound on North Wayside when he was hit by the cruiser's front left side, tragically ending his life.

After the accident, Officer Sartor with the Department's vehicular crimes division investigated the crash. Sartor concluded that a reasonably prudent officer could have believed that the need to reach the scene of the suicide outweighed the risk of harm to others from Hewitt's driving and that Hewitt's speed was not excessive. In Sartor's experience, the norm for police officers responding to those kinds of calls is roughly around 15 to 20 miles per hour over the speed limit. Although he acknowledged that had Hewitt requested and used lights and sirens, the accident possibly could have been avoided, Sartor also concluded that even if Hewitt had been traveling the speed limit, the cruiser still would have struck Foreman.

---

[8] A-pillars are "support posts that are positioned on either side of the windshield of a vehicle and connect the roof to the body." MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/A-pillar (last visited Apr. 12, 2024).

Foreman's heirs and estate (collectively, the Foremans[9]) sued the City for wrongful death, alleging that the City's employee negligently and proximately caused Foreman's death while operating a motor vehicle, such that the employee would be personally liable. The City moved for traditional summary judgment, asserting that its immunity from suit was not waived under the Tort Claims Act because Hewitt was entitled to official immunity.[10] The City's evidence consisted of Hewitt's affidavit and excerpts from Sartor's deposition transcript. In response, the Foremans presented Sartor's full deposition transcript, an expert declaration from Todd White (a retired former sergeant with the Department), and the message log report recovered from the cruiser's mobile data terminal.[11] The trial court denied the motion, and the City appealed.

---

[9] The Foremans consist of Foreman's mother Catrennia Foreman Sauls, individually and as representative of the estate, and Tristena Christian as next friend of Foreman's minor child.

[10] *See* TEX. CIV. PRAC. & REM. CODE § 101.021(1)(B). The City also moved for summary judgment on the ground that the Tort Claims Act did not apply because Hewitt was "responding to an emergency call" without "conscious indifference or reckless disregard for the safety of others." *See id.* § 101.055. The court of appeals held that a fact issue exists as to whether the dispatcher and the officer considered the call an emergency. 654 S.W.3d 772, 786-87 (Tex. App.—Houston [14th Dist.] 2022). Because we decide the appeal on the official-immunity ground, we do not address the emergency exception.

[11] The City contested White's expert qualifications, objected to specific statements in his declaration, and attached screenshots from Hewitt's and Curtis's body-camera footage. The trial court did not expressly rule on the objections. On appeal, the parties dispute the admissibility of this evidence and whether the objections were properly preserved. Given our disposition, we consider only evidentiary challenges that may be raised for the first time on appeal and otherwise assume the trial court properly admitted the evidence.

On interlocutory appeal,[12] a divided court of appeals affirmed. The majority held that the City did not conclusively establish Hewitt's good faith—a necessary element for official immunity—through the required need–risk factors.[13] In considering those factors, the majority noted that Hewitt (1) "never explicitly nor implicitly addressed why" he did not *temporarily* activate his emergency equipment and deactivate it before arriving at the destination and (2) "never addressed that he assessed the risk of collision . . . in light of the facts" that he was traveling in the dark without emergency equipment and with impediments to sight.[14] Justice Wise dissented, concluding that the City did not need to expressly identify all possible alternatives, Hewitt's explanation that emergency equipment could agitate the patient was sufficient, and Hewitt's affidavit considered the factual circumstances affecting the risk.[15] In Justice Wise's view, the majority's insistence that Hewitt should have addressed the alternative of temporarily using emergency equipment "is the type of hindsight that official immunity is designed to prevent."[16]

---

[12] *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8) (authorizing an interlocutory appeal from an order denying a governmental unit's plea to the jurisdiction); *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 549 (Tex. 2019) (allowing an interlocutory appeal from an order denying a motion for summary judgment that asserts governmental immunity).

[13] 654 S.W.3d at 781-85.

[14] *Id.* at 782-84.

[15] *Id.* at 787-88 (Wise, J., dissenting).

[16] *Id.* at 788.

7

The City filed a petition for review, which we granted to clarify the scope of official immunity.

## II. Discussion

We begin with a broad overview of the applicable law and standard of review. A city performing governmental functions may not be sued for its employees' conduct unless a plaintiff demonstrates the Legislature waived the city's governmental immunity.[17] To do so, the Foremans rely on Section 101.021(1) of the Tort Claims Act. Among other things, this provision makes a city liable for a death arising from the operation of a motor vehicle and proximately caused by an employee's negligence if the "employee would be personally liable" under Texas law.[18] Thus, if a legal doctrine protects the employee from personal liability, Section 101.021(1) does not waive immunity.

One such doctrine is official immunity, a common-law affirmative defense.[19] Official immunity shields government employees from liability in civil lawsuits that, with the benefit of hindsight, would second-guess their performance of discretionary duties and force them to defend decisions that were reasonable when made.[20] If these lawsuits distracted officials with litigation burdens and deterred their

---

[17] *Rattray v. City of Brownsville*, 662 S.W.3d 860, 865 (Tex. 2023); *see Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 746 (Tex. 2019) (cities, as political subdivisions, "share the state's immunity when performing governmental functions").

[18] TEX. CIV. PRAC. & REM. CODE §§ 101.021(1)(B), .025(a).

[19] *Ballantyne v. Champion Builders, Inc.*, 144 S.W.3d 417, 422, 424 (Tex. 2004).

[20] *Telthorster v. Tennell*, 92 S.W.3d 457, 463 (Tex. 2002).

"willingness to execute [their] office with the decisiveness and the judgment required by the public good," the public would suffer.[21] And "some of the most capable candidates would be deterred from entering public service if heavy burdens on their private resources from monetary liability were a likely prospect for errors in judgment."[22]

Given the utmost need for effective police officers of good character, the doctrine is perhaps most vital in police work.[23] In protecting the public, "officers must be free to make split-second judgments . . . based on their experience and training, without fear of personal liability" for every mistake.[24] Otherwise, "the constant threat of suit could 'dampen the ardor of all but the most resolute, or the most irresponsible.'"[25] Especially in volatile and changing circumstances, a high risk of personal liability could cause officers "'to act hesitantly when immediate action is required,' thereby endangering the public."[26]

Fundamentally, the doctrine's purpose is "to insulate the functioning of government from the harassment of litigation, not to

---

[21] *City of Lancaster v. Chambers*, 883 S.W.2d 650, 656 (Tex. 1994) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 240 (1974)).

[22] *Ballantyne*, 144 S.W.3d at 424.

[23] *See Travis v. City of Mesquite*, 830 S.W.2d 94, 103 (Tex. 1992) (Cornyn, J., concurring) ("Nowhere else in public service is official immunity more appropriate or necessary than in police work.").

[24] *Telthorster*, 92 S.W.3d at 463 (quoting *Travis*, 830 S.W.2d at 103 (Cornyn, J., concurring)).

[25] *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982)).

[26] *City of San Antonio v. Riojas*, 640 S.W.3d 534, 541 (Tex. 2022) (quoting *Telthorster*, 92 S.W.3d at 464).

protect erring officials."[27] Of course, public officials do err, but "the risk of some error is preferable to intimidation from action at all."[28] To minimize this risk while balancing the doctrine's societal benefits with citizens' right to recover for injuries arising from unreasonable conduct, official immunity protects governmental employees only when they are performing (1) discretionary duties, (2) in good faith, and (3) within the scope of their authority.[29]

Arguing that Hewitt's performance satisfied these elements, the City moved for traditional summary judgment on the ground that it retained its governmental immunity. The Foremans dispute whether Hewitt was performing a discretionary duty in good faith but not his scope of authority. To obtain summary judgment, "a movant must produce evidence showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law."[30] Our review is

---

[27] *Kassen v. Hatley*, 887 S.W.2d 4, 8 (Tex. 1994). Although the doctrine primarily serves the public good, we have noted "the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion." *City of Lancaster v. Chambers*, 883 S.W.2d 650, 656 (Tex. 1994) (quoting *Scheuer*, 416 U.S. at 240).

[28] *Ballantyne v. Champion Builders, Inc.*, 144 S.W.3d 417, 424 (Tex. 2004).

[29] *Telthorster*, 92 S.W.3d at 461, 464; *cf. Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (noting that the similar federal doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably"); *infra* note 46.

[30] TEX. R. CIV. P. 166a(c); *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 551-52 (Tex. 2019) (noting that summary judgment may be based on governmental immunity). Official immunity and governmental immunity,

de novo, and we view the evidence in the light most favorable to the nonmovant.[31]

## A. Discretionary Duty

We first consider whether Hewitt was performing a discretionary duty.[32] In conducting this type of inquiry, we have contrasted discretionary and ministerial duties.[33] A duty is discretionary if its performance involves "personal deliberation, decision, and judgment";[34] a duty is ministerial, on the other hand, if "the law prescribes and

---

however, must be distinguished. Official immunity protects individuals; governmental immunity protects governmental entities. *See DeWitt v. Harris County*, 904 S.W.2d 650, 654 (Tex. 1995). An individual defendant bears the burden to establish the elements of official immunity. *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 128 (Tex. 2015) ("[U]nlike sovereign immunity . . . official immunity is an affirmative defense that must be pled and proved by the party asserting it."). But governmental immunity from suit is a jurisdictional bar a plaintiff must overcome. *Swanson*, 590 S.W.3d at 549 n.6, 550. The court of appeals incorrectly stated that "[b]ecause official immunity is an affirmative defense, the burden rests on the City to establish all elements of that defense." 654 S.W.3d 772, 780 (Tex. App.—Houston [14th Dist.] 2022). The City, as the summary-judgment movant, bore the burden because of the procedural vehicle it chose to assert its entitlement to judgment. *See Swanson*, 590 S.W.3d at 551.

[31] *Swanson*, 590 S.W.3d at 551; *Laverie v. Wetherbe*, 517 S.W.3d 748, 752 (Tex. 2017).

[32] *Chambers*, 883 S.W.2d at 653.

[33] *Kassen v. Hatley*, 887 S.W.2d 4, 9 (Tex. 1994). Admittedly, as we have noted, this distinction may be "problematic" and more a matter of degree because "most duties involve some measure of discretion, including purely ministerial duties." *Id.* At its core, a duty's categorization as discretionary is "probably only a shorthand notation for a more complex policy decision." *Id.* (quoting PROSSER AND KEETON ON THE LAW OF TORTS § 132, at 1062 (W. Page Keeton et al. eds., 5th ed. 1984)).

[34] *Ballantyne v. Champion Builders, Inc.*, 144 S.W.3d 417, 425 (Tex. 2004); *Chambers*, 883 S.W.2d at 654.

11

defines the dut[y] to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment."[35]

The City presented evidence that Hewitt was performing a discretionary duty by responding to an emergency call: the priority two suicide call. When an operator of an emergency vehicle is responding to an emergency call, the Transportation Code authorizes the operator to disregard certain traffic laws, including traffic lights and speed limits, if they "operate the vehicle with appropriate regard for the safety of all persons" and without "reckless disregard for the safety of others."[36] Although department policies and municipal guidelines could constrain an officer's discretion,[37] here, the Department provides its officers with discretion to deviate from its standard response for priority two calls by requesting the use of emergency equipment if the circumstances clearly

---

[35] *Chambers*, 883 S.W.2d at 654 (quoting *Rains v. Simpson*, 50 Tex. 495, 501 (1878)). For example, in *Chambers*, we held that a police officer engaging in a high-speed pursuit is performing a discretionary duty. *Id.* at 655. We reasoned that an officer "must, in the first instance, elect whether to undertake pursuit" and that the pursuit will involve "discretion on a number of levels" in determining "which route should be followed, at what speed, should back-up be called for, and how closely should the fleeing vehicle be pursued." *Id.*

[36] TEX. TRANSP. CODE § 546.005; *see id.* §§ 546.001, .002(b)(1); *City of Houston v. Green*, 672 S.W.3d 27, 30 n.3 (Tex. 2023); *see also Chambers*, 883 S.W.2d at 655 (holding that the substantially similar predecessor statutes to Section 546.005 were "not sufficiently specific so as to leave no choice to an officer in the performance of these duties"). In determining if a duty is discretionary, we focus "on whether the officer is performing a discretionary function, not on whether the officer has discretion to do an allegedly wrongful act while discharging that function." *Chambers*, 883 S.W.2d at 653.

[37] *See id.* at 655 n.3 (indicating that specific municipal guidelines could affect whether actions are discretionary or ministerial).

12

warrant it.[38] Of necessity, these discretionary choices involve personal deliberation, decision, and judgment.

The Foremans do not dispute that a priority two suicide call would generally be an emergency or that responding to such a call would be performing a discretionary duty. Instead, they argue Hewitt was performing a ministerial duty because, based primarily on the contents of the 911 call, there was no emergency here. It is undisputed that Hewitt was not privy to the 911 call, and no transcript or recording of the call was included in the record. But the Foremans' expert, Todd White, explained that, "[a]s documented in the recording," "the caller reported that her sister had not taken her medication, but was not violent or suicidal" and "did not have any weapons or want[] to harm herself or others." White also noted that the dispatcher and Hewitt did not comply with the Department's response times for priority two calls.[39] Relying on these facts, White opined: "[T]he dispatch[er] and officer either did not classify this call as a [priority] 2, or at the very least, the officers and dispatch[er] actually did not consider this to be a [priority] 2, based on their failure to follow the process."

---

[38] *See* TEX. TRANSP. CODE §§ 546.003 (requiring an emergency-vehicle operator to use lights or sirens "at the discretion of the operator in accordance with policies of the department or the local government that employs the operator" when engaging in authorized conduct to disregard traffic laws), .004(c) (permitting a police officer not to use lights or sirens in certain specified circumstances while responding to an emergency call or pursuing a suspect).

[39] White noted that both the dispatcher and Hewitt exceeded their five-minute response times: the dispatcher held the call until 9:05 p.m. and, as of 9:11 p.m., Hewitt was only halfway to the destination.

13

White's expert opinion, however, fails to raise a fact issue on whether Hewitt was performing a discretionary duty. First, his opinion that the call was not classified as priority two constitutes no evidence because it is speculative, conclusory, and assumes facts that are contrary to those on the face of the record.[40] The message log report recovered from Hewitt's mobile data terminal conclusively established that the call was classified as priority two,[41] and Hewitt had no notice of the contents of the 911 call to evaluate his response to the priority two call any differently.[42] Second, White's opinion that the officers did not consider the call to be priority two—even if it was classified as one—is perhaps supported by at least circumstantial evidence, given that the officers exceeded the Department's response times. But the City claims that it is just as reasonable to infer "that there simply was not manpower available to respond to the call sooner" or that the "standard is a goal and we don't always get there." Even assuming White is

---

[40] *See Wadewitz v. Montgomery*, 951 S.W.2d 464, 466 (Tex. 1997) ("Conclusory statements by an expert are insufficient to support or defeat summary judgment."); *see also Windrum v. Kareh*, 581 S.W.3d 761, 770 (Tex. 2019) (noting that no objection to the admissibility of conclusory testimony is necessary if the opinion "was speculative or conclusory on its face[] or assume[s] facts contrary to those on the face of the record" (quoting *Arkoma Basin Expl. Co. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 388 (Tex. 2008))).

[41] *See supra* notes 3, 5-6.

[42] *Wal-Mart Stores, Inc. v. Merrell*, 313 S.W.3d 837, 839 (Tex. 2010) (noting in the summary-judgment context that conclusory or speculative opinion testimony "is not relevant evidence, because it does not tend to make the existence of a material fact more probable or less probable" and therefore constitutes no evidence (quoting *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004))); *see Windrum*, 581 S.W.3d at 769 (noting that an expert's opinion is conclusory if "he offers only his word that the bases offered to support his opinion actually exist or support his opinion").

14

correct, his opinion provides no support that Hewitt was performing a ministerial duty. The Department considers a priority two call an emergency, and only supervising officers may change the priority. Hewitt, as a nonsupervising officer, had no discretion to respond to the call as anything other than an emergency priority two call, although he did have discretion as to *how* he would respond to the emergency.[43]

We therefore hold that, as a matter of law, Hewitt was performing a discretionary duty in responding to the emergency call when the accident occurred.

## B. Good Faith

We next consider whether Hewitt was performing this discretionary duty in "good faith." To provide context, we first describe the development and contours of the test. Turning next to the summary-judgment evidence, we conclude that the City established Hewitt's good faith and the Foremans failed to controvert the City's proof.

### 1. The Objective-Reasonableness Test

In 1994, we adopted the following test in *City of Lancaster v. Chambers* to measure an officer's good faith in a pursuit case: whether "a reasonably prudent officer, under the same or similar circumstances, *could have believed* that the *need* to immediately apprehend the suspect

---

[43] Sartor testified that Hewitt and Curtis could not "have decided on their own that the call that they were responding to was not an emergency." *See City of Houston v. Hatton*, No. 01-11-01068-CV, 2012 WL 3528003, at *3 (Tex. App.—Houston [1st Dist.] Aug. 16, 2012, pet. denied) (concluding that an officer was required to use his professional judgment in responding to a priority one request for assistance even if he had no choice but to respond to that request).

15

outweighed a clear *risk* of harm to the public in continuing the pursuit."[44] This good-faith test, perhaps inaptly named given the subjective connotations, is "one of objective legal reasonableness, without regard to whether the government official involved acted with subjective good faith."[45] And the "could have believed" aspect does not require a showing that "all reasonably prudent officers" would have taken the action; it requires only that "a reasonably prudent officer might have believed" that the action should have been taken.[46]

---

[44] 883 S.W.2d 650, 656 (Tex. 1994) (emphases added).

[45] *Id.* (quoting *Swint v. City of Wadley*, 5 F.3d 1435, 1441-42 (11th Cir. 1993)); *see Ballantyne v. Champion Builders, Inc.*, 144 S.W.3d 417, 428 (Tex. 2004) (rejecting the court of appeals' determination that "subjective bad faith should be considered in evaluating good faith").

[46] *Chambers*, 883 S.W.2d at 656-57. Federal courts have recognized a similar doctrine—qualified immunity—which has been increasingly scrutinized by "a growing, cross-ideological chorus of jurists and scholars," including our former colleague. *Zadeh v. Robinson*, 928 F.3d 457, 480 (5th Cir. 2019) (Willett, J., concurring). The debate has generally focused on two components of the federal doctrine: (1) its "clearly established law" standard; and (2) Section 1983's textual basis for the doctrine's formulation. *See, e.g.*, *Rogers v. Jarrett*, 63 F.4th 971, 979 (5th Cir. 2023) (Willett, J., concurring) (identifying scholarship arguing that 42 U.S.C. § 1983 "unequivocally negated the original interpretive premise for qualified immunity"); *Zadeh*, 928 F.3d at 479-81 (Willett, J., concurring) (criticizing the "clearly established law" standard). Without expressing an opinion on either line of critique, we note that neither applies to our common-law doctrine, which has no "clearly established law" standard. *See Chambers*, 883 S.W.2d at 657 (although "federal immunity may be conferred at the summary judgment stage by the court's finding that the constitutional right at issue was not clearly established," "[n]o analogous threshold legal question has been written into a good faith test for immunity from nonconstitutional torts").

16

Three years later, in *Wadewitz v. Montgomery*, we applied the *Chambers* test to an emergency-response case.[47] In so doing, we developed particularized need–risk factors to substantiate conclusions about the existence of good faith:

> The "need" aspect of the test refers to the urgency of the circumstances requiring police intervention. In the context of an emergency response, need is determined by factors such as the seriousness of the crime or accident to which the officer responds, whether the officer's immediate presence is necessary to prevent injury or loss of life or to apprehend a suspect, and what alternative courses of action, if any, are available to achieve a comparable result. The "risk" aspect of good faith, on the other hand, refers to the countervailing public safety concerns: the nature and severity of harm that the officer's actions could cause (including injuries to bystanders as well as the possibility that an accident would prevent the officer from reaching the scene of the emergency), the likelihood that any harm would occur, and whether any risk of harm would be clear to a reasonably prudent officer.[48]

As we later explained, these "particularized need/risk factors were crafted in an attempt to tailor a test that would better weigh the risks that high-speed chases and responses pose to the general public."[49] But we have "expressly refused" to require and apply these factors "outside the context of a high-speed chase or other emergency law-enforcement response that carries an inherent risk of harm to the public."[50]

---

[47] 951 S.W.2d 464, 466 (Tex. 1997).

[48] *Id.* at 467.

[49] *Telthorster v. Tennell*, 92 S.W.3d 457, 464 (Tex. 2002).

[50] *City of San Antonio v. Riojas*, 640 S.W.3d 534, 535 (Tex. 2022).

In applying this test, the touchstone has been and remains "what a reasonable officer *could have believed* under the circumstances"—an objective inquiry.[51]  As we noted in *Wadewitz*, "good faith depends on how a reasonably prudent officer could have assessed both the *need* to which an officer responds and the *risks* of the officer's course of action, based on the officer's perception of the facts at the time of the event."[52] To satisfy this inquiry, the "summary judgment proof" must "sufficiently assess[] the *Wadewitz* need/risk factors."[53]  This particularized showing substantiates with facts "a suitable basis for concluding that a reasonable officer" in that position "could or could not have believed" that the actions at issue were justified.[54]  For example, an expert "must address what a reasonable prudent officer could have believed under the circumstances, as well as the need and risk factors," to "prove the expert had a suitable basis for concluding that a reasonable prudent officer in the same position could or could not have believed the actions were justified."[55]  But the test does not require proof that the officer considered and assessed the *Wadewitz* need–risk factors *ex ante*.  Such

---

[51] *Wadewitz*, 951 S.W.2d at 467.

[52] *Id.*; *see Tex. Dep't of Pub. Safety v. Bonilla*, 481 S.W.3d 640, 644 (Tex. 2015) ("[T]he determinative inquiry is whether any reasonably prudent officer possessed of the same information could have determined the [officer]'s actions were justified.").

[53] *Telthorster*, 92 S.W.3d at 462 (noting that in *University of Houston v. Clark* "[w]e held that a police officer's summary judgment proof does not offer a suitable basis for determining good faith unless it sufficiently assesses the *Wadewitz* need/risk factors" (citing 38 S.W.3d 578, 584-85 (Tex. 2000))).

[54] *Wadewitz*, 951 S.W.2d at 467.

[55] *City of San Antonio v. Ytuarte*, 229 S.W.3d 318, 321 (Tex. 2007).

a requirement would fundamentally alter the test from one of objective legal reasonableness to a subjective test.[56]

At times, we have been less than precise in describing and applying this test, and our language may have wrongly implied that the officer must have actually considered and assessed the need–risk factors while performing his or her discretionary duties.[57] Although the good-faith inquiry "must be filtered through the lens of the officer's perceptions at the time of the incident,"[58] the test's focus is on the objective facts and information the officer knew and perceived, not whether the officer had subjectively considered and assessed certain factors.[59] Ultimately, the officer's actions—not his or her subjective assessments—must be justified with reference to what a reasonably prudent officer, possessed of the same information and under the same

---

[56] *See Ballantyne v. Champion Builders, Inc.*, 144 S.W.3d 417, 428 (Tex. 2004) (describing the "important reasons for limiting reliance only to objective evidence in consideration of good faith," including the increased societal costs of broad-ranging discovery that may be necessary for determining an official's subjective thoughts and motivations).

[57] *See, e.g.*, *Bonilla*, 481 S.W.3d at 644 ("Evidence of an officer's good faith must be substantiated with facts showing *the officer assessed* both the need to apprehend the suspect and the risk of harm to the public. . . . [T]he evidence must nevertheless show *the officer assessed* the availability of any alternative course of action." (emphases added)); *Clark*, 38 S.W.3d at 581 ("[T]estimony on good faith must discuss what a reasonable officer could have believed under the circumstances, and must be substantiated with facts showing *that the officer assessed* both the need to apprehend the suspect and the risk of harm to the public." (emphasis added)).

[58] *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994).

[59] *Wadewitz*, 951 S.W.2d at 467.

or similar circumstances, could have believed in light of the need–risk factors.[60]

Since *Chambers* and *Wadewitz*, we have emphasized that this objective good-faith test "does not place an onerous burden on law enforcement."[61] It protects "all but the plainly incompetent" and is akin to the deferential abuse-of-discretion standard.[62] The focus is not on "what a reasonable person *would have done*"—as in a general negligence test—but on "what a reasonable officer *could have believed*."[63] The test is a holistic inquiry, not a pro forma factor checklist, with no magic words required.[64] Risks that are generally "present to some degree" do not need to be "explicitly mention[ed]" and can be addressed through describing the facts and circumstances that affected the risks.[65] Alternative courses of action may be "implicitly discounted" instead of "explicitly address[ed]."[66] Even if the evidence reveals a viable alternative, good faith is not necessarily negated; the availability of alternatives "is just one factor" and "does not alone determine good

---

[60] *Id.*

[61] *City of San Antonio v. Riojas*, 640 S.W.3d 534, 540 (Tex. 2022).

[62] *City of Lancaster v. Chambers*, 883 S.W.2d 650, 656, 657 n.7 (Tex. 1994) (quoting *Swint v. City of Wadley*, 5 F.3d 1435, 1442 (11th Cir. 1993)); *see Riojas*, 640 S.W.3d at 540; *City of San Antonio v. Ytuarte*, 229 S.W.3d 318, 321 (Tex. 2007).

[63] *Telthorster v. Tennell*, 92 S.W.3d 457, 465 (Tex. 2002) (quoting *Wadewitz*, 951 S.W.2d at 467 n.1).

[64] *Tex. Dep't of Pub. Safety v. Bonilla*, 481 S.W.3d 640, 645 (Tex. 2015).

[65] *Univ. of Hous. v. Clark*, 38 S.W.3d 578, 586 (Tex. 2000).

[66] *Bonilla*, 481 S.W.3d at 645.

faith."[67]  And in a given situation, a reasonably prudent officer might not have been "able to thoroughly analyze each need or risk factor."[68] Depending on the circumstances, "this alone should not prevent the officer from establishing good faith"—in responding to emergencies, officers must make split-second decisions while under intense pressure,[69] and an objective-reasonableness test must allow for that fact.

The nonmovant, in contrast, bears an "elevated standard of proof" to "defeat a claim of official immunity in response to a motion for summary judgment."[70]  Proof that a reasonably prudent officer could have assessed the needs and risks differently is insufficient.[71]  To controvert proof of good faith, the plaintiff must show, with "reference to each aspect of the need and risk balancing test,"[72] that *no* reasonably prudent officer "in the defendant's position could have thought the facts were such that they justified defendant's acts."[73]  If reasonably prudent officers "could disagree on this issue, immunity should be recognized."[74]

---

[67] *Id.* at 644 (quoting *Clark*, 38 S.W.3d at 588).

[68] *Clark*, 38 S.W.3d at 583.

[69] *Id.*

[70] *City of Lancaster v. Chambers*, 883 S.W.2d 650, 656 (Tex. 1994).

[71] *City of San Antonio v. Ytuarte*, 229 S.W.3d 318, 321 (Tex. 2007).

[72] *Clark*, 38 S.W.3d at 588.

[73] *Chambers*, 883 S.W.2d at 657 (quoting *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1557 (11th Cir. 1993)).

[74] *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

## 2. Proof of Good Faith

Turning to the evidence in this case, both Hewitt and Sartor opined that a reasonably prudent officer under the same or similar circumstances could have believed that Hewitt's actions were justified based on his perception of the facts at the time of the incident. But the court of appeals concluded the City failed to substantiate those conclusions with the *Wadewitz* particularized need–risk factors to satisfy its summary-judgment burden. We disagree.

As to the "need" aspect of the test, the City adduced evidence that a reasonably prudent officer, possessing the same information to which Hewitt was privy, could have believed the suicide call was a serious situation requiring the officer's immediate presence to prevent injury or loss of life.[75] Sartor described the situation as a "serious matter" and explained that officers "just have to go by what's going on—what they're told" and "the information that [Hewitt and Curtis] ha[d] is they know it's a suicide, threat to life," which provides a reason for exceeding the speed limit. Hewitt testified that the 911 dispatcher had told them there was a suicide in progress with a patient who was irate, destroying property, and had a knife, and that the priority two call "had already been holding for 10 minutes," so their "response was very urgent." Based on his experience, Hewitt explained that when those "calls drop, you never know what you are walking into" and although a "patient can

---

[75] *See Wadewitz v. Montgomery*, 951 S.W.2d 464, 467 (Tex. 1997) (identifying the "need" factors of "the seriousness" of the incident, "whether the officer's immediate presence is necessary to prevent injury or loss of life or to apprehend a suspect," and "what alternative courses of action, if any, are available to achieve a comparable result").

be merely destructive of property," "the individual could have already physically injured themselves."[76]   Accordingly, his opinion was that speeding at 55 to 60 miles per hour "was necessary and reasonable."

Hewitt also discussed the alternative of using emergency equipment.   Hewitt averred that an officer may vary from the Department's standard approach by requesting to use emergency equipment if the situation clearly warrants it.[77]   But according to Hewitt, a reasonably prudent officer could decide to adhere to the standard approach of using no lights or sirens for responding to a priority two call in these circumstances because of the public-safety need of the patient: the lights and sirens "can agitate the patient and put them on the defensive rather than understanding officers are there to help."[78]

The court of appeals nevertheless faulted Hewitt for not addressing the alternative option of "temporarily activat[ing] his emergency lights and siren when he left the police station and then deactivat[ing] the emergency equipment before arriving at the suicidal patient's home."[79]   Although Hewitt did not expressly address this

---

[76] Sartor also explained that even though the dispatch call slip may have indicated that no weapons were involved, the situation involved a suicidal person where "[a]nything can happen," and the officers receive training of there being "no weapons and then all of a sudden there being weapons involved."

[77] For example, Sartor explained that on the freeways, "if you have a bunch of traffic in your way, you have to use your lights and sirens to get by them on the side."

[78] *See supra* note 7.

[79] 654 S.W.3d 772, 783 (Tex. App.—Houston [14th Dist.] 2022).

alternative, by describing when an officer may vary from the Department's approach and explaining why a reasonably prudent officer generally would adhere to the standard approach in responding to a suicide call, Hewitt implicitly discounted the option of temporarily requesting the use of emergency equipment.[80] We conclude that Hewitt's affidavit adequately addressed the alternative courses of action that a reasonable officer could take, and the court of appeals erred in holding otherwise.[81]

Regarding the "risk" factors, the City's evidence addressed the facts and circumstances that affected "the nature, severity, likelihood, and obviousness of the risks of the officer's actions"[82] and Hewitt's mitigating efforts. Hewitt discussed impediments to his sight: the dark roadside lighting, the A-pillar of his cruiser, the trees in the median, and the lack of reflectors or lights on Foreman's bicycle. Hewitt also noted conditions that minimized the risk: the traffic was fairly light, the weather was clear, and the roads were dry. And Sartor explained that

---

[80] *See Tex. Dep't of Pub. Safety v. Bonilla*, 481 S.W.3d 640, 645 (Tex. 2015) ("Although not explicitly addressing alternatives to pursuit, the trooper implicitly discounted the viability of other alternatives based on his stated belief that immediate action was necessary and his inability to identify the driver at that time.").

[81] *See id.* ("The fact that the trooper did not expressly identify 'alternatives' that may have been considered does not render the evidence deficient."). The Foremans' lead authority, *City of Pasadena v. Belle*, 297 S.W.3d 525 (Tex. App.—Houston [14th Dist.] 2009, no pet.), was decided before *Bonilla*. Moreover, *Belle* did not consider implicit discounting, and the officer there allegedly violated department policy in not using emergency equipment, so it would not affect our analysis even if it were otherwise applicable. *Id.* at 529, 533-34.

[82] *Univ. of Hous. v. Clark*, 38 S.W.3d 578, 582 (Tex. 2000).

even though there were "trees every once in a while in the center median for any other traffic coming off the side," there were no obstructions "[f]or looking down south" while traveling on North Wayside. As Hewitt was not using his emergency equipment, he described taking the precaution of stopping at the red light and waiting for a green signal before proceeding. He acknowledged his speeding on North Wayside but explained that he was able to focus his "attention on driving in as safe a manner as [he] reasonably could" because his partner Curtis was in the vehicle and could monitor the mobile data terminal. According to Sartor, the speeding was consistent with the norm for officers responding to those types of calls and not excessive, and the cruiser still would have struck Foreman even if Hewitt had not been speeding. Hewitt concluded his affidavit testimony by stating he "considered both the risk of harm to others from the patient in crisis as well as risk of harm to other drivers from my driving to reach the scene."

Belying the statements in Hewitt's affidavit, the court of appeals held that "Hewitt never addressed that he assessed the risk of collision in light of . . . other pertinent circumstances affecting the risks," including the dark lighting, the impediments to sight, and the lack of emergency equipment.[83] Even if the court had accurately described Hewitt's testimony, it erred by requiring proof that Hewitt subjectively assessed the *Wadewitz* need–risk factors during his emergency response. Hewitt described the facts and specific circumstances affecting these risks that generally are present with driving above the

[83] 654 S.W.3d at 784.

speed limit in those conditions. This is sufficient to "establish facts upon which the court could base its legal conclusion";[84] to require more would impose a "[m]agic words" test that we have disavowed.[85]

We therefore hold that the City satisfied its summary-judgment burden to make a prima facie showing of Hewitt's good faith. The City's evidence includes the facts and circumstances necessary to address the *Wadewitz* need–risk factors and to substantiate Hewitt's and Sartor's opinions that a reasonably prudent officer in the same or similar circumstances could have believed Hewitt's actions were justified. Although the court of appeals did not reach the issue, we now turn to whether the Foremans presented evidence to controvert the City's proof of good faith.

### 3. Controverting Evidence

Because the summary-judgment record bears competent evidence of good faith, good faith is established unless the Foremans show that no reasonably prudent officer in Hewitt's position could have thought the facts justified his actions.[86] In a declaration, the Foremans' expert White opined that "no reasonable person in the officer's position could have thought the facts were such that they justified driving at the excessive speeds, with known poor vision, and at the same time failing to keep a proper lookout or line of site, while ignoring the safer and more reasonable alternatives." We hold that his opinion is conclusory, as his discussion of the facts and circumstances of each aspect of the need–risk

---

[84] *Clark*, 38 S.W.3d at 585-86.

[85] *Bonilla*, 481 S.W.3d at 645.

[86] *See id.* at 643.

balancing test fails to adequately substantiate his conclusion and satisfy the elevated standard of proof for controverting good faith.[87]

As to the "need" aspect, White did not consider the factors from an objective standpoint based on information available to Hewitt at the relevant time, as required to controvert proof of good faith. White concluded that "the situation was not serious" and the "officer's immediate presence was not necessary" by improperly relying on: (1) information Hewitt was not privy to at the time, specifically the contents of the 911 call;[88] (2) Hewitt's subjective state of mind as inferred from his actions;[89] and (3) hindsight information, including that the dispatcher downgraded the suicide call after the accident and the officers did not appear to reach the destination.[90] White also ignored undisputed evidence that would be relevant to what a reasonable officer could have believed, based on a perception of the facts at the time. For

---

[87] *Clark*, 38 S.W.3d at 587; *see Wadewitz v. Montgomery*, 951 S.W.2d 464, 466 (Tex. 1997) ("Conclusory statements by an expert are insufficient to support or defeat summary judgment.").

[88] *See Telthorster v. Tennell*, 92 S.W.3d 457, 466 (Tex. 2002) (explaining that the good-faith test considers what a reasonable officer could have believed "based on the information [the officer] possessed at the time").

[89] For example, White opined that "if Hewitt had subjectively believed that the situation required an emergency response," "the officers could have avoided a 30-second delay by turning on their siren to pass through the red-light." *See Wadewitz*, 951 S.W.2d at 466 (noting that good faith is measured "against a standard of objective legal reasonableness, without regard to the officer's subjective state of mind"); *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994) ("Subjective factors involving the officer's motives, intent, or propensities are not relevant.").

[90] *See Telthorster*, 92 S.W.3d at 466 (holding that a conclusion that good faith was lacking based on what became known after the accident is "unduly informed by hindsight").

example, although White included a screenshot of the dispatch call slip in his declaration, he never discussed how a reasonable officer could or would interpret the need to respond based on the message: "Yes, I am trying to kill myself or harm someone else."[91]

As to "risks," White discussed many of the same facts and circumstances affecting the general risks that Hewitt discussed, including the speeding and impediments to sight.[92] But given his reliance on improper information in discussing the "need" factors of the urgency of the circumstances and seriousness of the call, White's opinion is "a one sided analysis" insufficient to satisfy the Foremans' elevated burden and defeat summary judgment.[93]

---

[91] (All caps removed.) *See supra* note 6.

[92] White also claimed that "[r]eview of the body cam footage by Officer Curtis indicates that Officer Hewitt was not watching the road immediately prior to the crash, but instead appeared to be turning on his own body camera," causing the additional risk of "an officer who did not maintain an adequate lookout or vision." But the City submitted screenshots from Curtis's and Hewitt's body-camera footage revealing that the videos do not show the officers' heads to determine where the officer was looking. *See supra* note 11. Thus, White's offered basis for his conclusion that Hewitt was not watching the road provides no support, and the conclusory statement is not probative evidence. *See Gunn v. McCoy*, 554 S.W.3d 645, 662 (Tex. 2018) ("[I]f no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection." (quoting *Hous. Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 829 (Tex. 2014))).

[93] *See City of San Antonio v. Ytuarte*, 229 S.W.3d 318, 321 (Tex. 2007) (explaining that "a one sided analysis" from the plaintiff's expert that discusses only one aspect of the need–risk test "does not provide a basis for concluding whether the officers acted reasonably" and is insufficient to controvert proof of good faith).

Finally, White identified alternative courses of action and opined that Hewitt "could have temporarily used emergency equipment"—as the sirens would not have "impacted the alleged suicidal individual" until Hewitt was close to the destination—or avoided a "30-second delay by turning on their siren to pass through the red-light" before turning on North Wayside. The Foremans also argued that Hewitt could have used "lights without sirens." With the benefit of time and hindsight, a lawsuit will often dissect each moment of an emergency response to identify and isolate subsidiary alternatives within overarching ones that perhaps could have been more thoroughly considered to lead to a putatively better decision, as White did here. But that is not what good faith requires. If the test is to mean anything, it will protect officers objectively acting in good faith, even if they could have made other reasonable decisions, may have acted negligently, or did not consider and assess all possible subsidiary alternatives.[94] Good faith does not require that the officer made the best decision or eliminated all risk, especially when the officer has acted in the heat of an emergency response and decided to adhere to the department's standard approach.[95] Here, Hewitt explained why a reasonably prudent officer would not vary from the Department's standard approach to take the

---

[94] *Tex. Dep't of Pub. Safety v. Bonilla*, 481 S.W.3d 640, 645 (Tex. 2015); *City of Lancaster v. Chambers*, 883 S.W.2d 650, 655 (Tex. 1994).

[95] *See Bonilla*, 481 S.W.3d at 643 ("Viewed properly, the good-faith standard is analogous to an abuse-of-discretion standard that protects 'all but the plainly incompetent or those who knowingly violate the law.'" (quoting *Ytuarte*, 229 S.W.3d at 321)); *Ballantyne v. Champion Builders, Inc.*, 144 S.W.3d 417, 426 (Tex. 2004) (noting that the good-faith "inquiry is not what was the best course of action").

overarching alternative of using emergency equipment in response to a priority two suicide call. In light of the City's proof and considering the balancing test as a whole, we conclude that, under these circumstances, the subsidiary alternatives identified by White do not substantiate his controverting conclusion.[96]

At most, White's opinion raises a fact issue regarding Hewitt's negligence or that a reasonably prudent officer *could* have made a different decision. In other words, a reasonably prudent officer could have believed speeding was not necessary or the circumstances warranted requesting emergency equipment and deviating from the Department's standard approach, at least temporarily. But evidence of negligence alone is not enough to controvert proof of good faith,[97] and the "elevated standard of proof" requires a plaintiff to show that no reasonable officer in the same or similar circumstances could have thought the facts were such that they justified the acts at issue.[98] White did not substantiate such a conclusion. We therefore hold that the Foremans failed to controvert the City's proof of good faith.

---

[96] *See Bonilla*, 481 S.W.3d at 644-45; *see also Univ. of Hous. v. Clark*, 38 S.W.3d 578, 588 (Tex. 2000) (noting that the availability of alternatives "is just one factor of the need/risk balancing test").

[97] *See Wadewitz v. Montgomery*, 951 S.W.2d 464, 467 (Tex. 1997) ("Evidence of negligence alone will not controvert competent evidence of good faith."); *Chambers*, 883 S.W.2d at 655 ("If public officials perform their duties without negligence, they do not need immunity. The complex policy judgment reflected by the doctrine of official immunity, if it is to mean anything, protects officers from suit even if they acted negligently.").

[98] *See Chambers*, 883 S.W.2d at 656-57.

### III. Conclusion

For these reasons, we conclude the City established that, as a matter of law, Officer Hewitt would be entitled to official immunity for the actions at issue while he was responding to the priority two suicide call. Because Section 101.021(1) of the Tort Claims Act waives immunity only if the governmental employee would be personally liable under Texas law, the City retained its immunity from suit and has shown that it is entitled to summary judgment. Accordingly, we reverse the court of appeals' judgment and render judgment dismissing the case.

John P. Devine
Justice

**OPINION DELIVERED:** May 10, 2024

31